AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

| LODGED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| 4/5/2021 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ JB _____ DEPUTY |

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED |
| --- |
| CLERK, U.S. DISTRICT COURT |
| 04/05/21 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___ jm ___ DEPUTY |

United States of America

v.

CONSTANTIN VORNICU and
COSMIN SPIRIDON,

　　　　　Defendant(s)

Case No.   2:21-mj-01613 -DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

As described in the accompanying attachment, defendant violated the following statutes:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. §§ 1344, 1349, 1028A | Conspiracy to Commit Bank Fraud, Aggravated Identity Theft |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

　　　　　　　　　　　　　　　　　　　*/s Rene Persaud*
　　　　　　　　　　　　　　　　　　　*Complainant's signature*

　　　　　　　　　　　　　　　　　　　Rene Persaud, Special Agent
　　　　　　　　　　　　　　　　　　　*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:　　　04/05/21

City and state:　　Los Angeles, California

　　　　　　　　　　　　　　　　　　　*Judge's signature*

　　　　　　　　　　　　　　　　　　　Hon. Maria A. Audero, U.S. Magistrate Judge
　　　　　　　　　　　　　　　　　　　*Printed name and title*

AUSA Andrew Brown, 11th Floor, x0102

**Complaint Attachment**

Count One, 18 U.S.C. § 1349

Beginning in or before 2018, and continuing through at least April 5, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendants CONSTANTIN VORNICU and COSMIN SPIRIDON, and others, conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1344.  The object of the conspiracy was carried out, and to be carried out, in substance, as follows:  Defendants VORNICU and SPIRIDON would secretly install skimming devices in ATMs to record the account information of bank customers, and would then counterfeit debit and credit cards bearing that information.  Defendants VORNICU and SPIRIDON and their co-conspirators would use the counterfeit cards to withdraw funds in the names of those victims of identity theft, and would share the proceeds as send them abroad.  Federally-insured financial institutions defrauded as a result of this conspiracy include Schools First Federal Credit Union, LBS Financial Credit Union, Union Bank, Comerica Bank, and Wells Fargo Bank.

Count Two, 18 U.S.C. § 1028A

Beginning in or before 2018, and continuing through at least April 5, 2021, in Los Angeles County, within the Central District of California, and elsewhere, defendants CONSTANTIN VORNICU and COSMIN SPIRIDON knowingly transferred, possessed, and used, without lawful authority, a means of identification of another person during and in relation to a felony violation of Title 18, United States Code, Section 1349, Conspiracy to Commit Bank Fraud, as charged in Count One, knowing that the means of identification belonged to another actual person.

### AFFIDAVIT

I, Rene Persaud being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since September 2018.  Prior to becoming a SA, I worked for the FBI's Special Surveillance Group for approximately four years.  Prior to joining the FBI, I was a Deputy Sheriff for the Hillsborough County (Florida) Sheriff's Office for approximately three years.

2.   I have participated in various aspects of criminal enterprise investigations, including but not limited to, conducting surveillance and arrests, issuing subpoenas, seizing and impounding drug evidence, social media analysis, and the analysis of telephone tolls and other data.  Additionally, I have interviewed and/or debriefed confidential informants and other witnesses who have had knowledge regarding the investigations in which I have been involved. I have also authored, sworn out, and executed multiple search warrants for various entities, including but not limited to, internet service providers, social media companies, GPS tracking units, and physical residences/businesses.

### II.  PURPOSE OF AFFIDAVIT: ARREST & SEARCH WARRANTS

3.   This affidavit is made in support of a criminal complaint and arrest warrants against CONSTANTIN VORNICU ("VORNICU") and COSMIN SPIRIDON ("SPIRIDON") (collectively known

1

as the "SUBJECTS"), for conspiracy to commit bank fraud and aggravated identity theft, in violation of Title 18, United States Code, Sections 1344, 1349, and 1028A.

4.   This affidavit is also made in support of search warrants for the residences and vehicles of VORNICU and SPIRIDON and their co-conspirators for evidence of conspiracy to commit bank fraud, conspiracy to launder money, and aggravated identity theft, in violation of Title 18, United States Code, Sections 1344, 1349, 1956, and 1028A, as described in Attachment B, which is incorporated by reference.

5.   The information set forth in this affidavit is based upon my participation in the investigation, encompassing my personal knowledge, observations and experience, as well as information obtained through my review of evidence, investigative reports, and information provided by others, including other law enforcement partners.  As this affidavit is being submitted for the limited purpose of securing the requested warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause for the requested warrants.

### III. **PREMISES TO BE SEARHED**

6.   The premises to be searched (collectively, the "SUBJECT PREMISES") are the vehicles and apartments used by VORNICU and SPIRIDON and their co-conspirators, namely:

a.    700 WEST 9TH STREET, APARTMENT 3013, AND PARKING SPACE L3139, LOS ANGELES, described more fully in attachment A, which is incorporated by reference.

b.    6550 YUCCA STREET, APARTMENT 203, LOS ANGELES, described more fully in attachment A, which is incorporated by reference.

c.    711 PACIFIC COAST HIGHWAY UNIT 326 AND PARKING SPACE 326, HUNTINGTON BEACH, described more fully in attachment A, which is incorporated by reference.

d.    WHITE CHRYSLER 300, AZ LICENSE PLATE CWL4268, VIN 2C3CCABG5MH529132, registered to EAN Holdings ("VORNICU'S WHITE CHRYSLER").

e.    WHITE DODGE CHALLENGER, CA LICENSE PLATE 8UXT444, VIN 2C3CDZGG3MH539369, registered to EAN Holdings ("SPIRIDON'S WHITE CHALLENGER").

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   Summary and Background of Investigation

7.    According to information provided by Romanian law enforcement, Florin Chiforsecu (Chiforsecu) is the head of a Romanian organized crime enterprise (ROC) operating in the United States, the United Kingdom, and other countries. The primary criminal scheme orchestrated by this ROC is Access Device/Bank Fraud. This ROC carries out the fraud by installing "skimming devices" in ATM card readers, stealing customer credit card numbers and their PIN numbers, fraudulently withdrawing cash from victim customer accounts, and laundering the profits

3

of this fraud back to Romania via hawala and/or wire transfers while depositing their split of the profits into their American bank accounts.  Chiforsecu's brother, VORNICU, runs the California-based operations for Chiforsecu's organization in conjunction with SPIRIDON and Daniel Arsin.

8.   This is corroborated by observations made during physical surveillance, the analysis of banking records, and the review of ATM Surveillance footage which captures members of the ROC unlawfully accessing the bank accounts of victim customers and unlawfully withdrawing cash from victim customer accounts. Specifically, law enforcement officers conducted surveillance and observed VORNICU and SPIRIDON accessing multiple ATMs and inserting multiple cards into those ATMs. Preliminary results from inquires made to financial institutions indicate that VORNICU and SPIRIDON unlawfully accessed at least 500 customer accounts identified through ATM photographs and surveillance; the true number is likely orders of magnitude higher.

9.   This is also corroborated by reports provided by the Newport Beach Police Department, the Tustin Police Department, and Comerica Bank, which identified, with surveillance video, VORNICU and SPIRIDON installing skimming devices in ATM terminals as far back as December 2019.

B.   **Explanation of Access Device Fraud Scheme**

10.   An ATM skimming device is an electronic device that can be manually installed at walk-up ATM terminals in order to capture the credit cards numbers of customers using the ATM. The

card readers are surreptitiously inserted into the ATM card slots, and are thin enough to go unnoticed to a lay person using an ATM. In addition to the card reader, another device is installed to obtain the PIN number. This device is usually a covert camera that captures customers entering their PIN number.

11.   An ATM skimming device is installed for as short as six hours, and as long as twenty-four hours, at which point the members of the ROC will remove the device. Once the device is removed, the customer credit card numbers and PIN numbers are retrieved from the device. The card numbers are then loaded on to blank credit cards, and those cards are given to "cash-out crews" who travel to other ATMs and fraudulently withdraw funds from victim customer accounts.

12.   The stolen funds are then split amongst the members of the crew in the United States. The profits for subjects overseas are transferred via wire or sent to Romania via a United Kingdom-based hawala. The profits for subjects in the United States are maintained in cash or deposited into American bank accounts.

## C.   Investigative Attempts to Locate VORNICU and SPIRIDON

13.   Upon opening the investigation in November 2020, I attempted to use traditional investigative means to locate VORNICU and SPIRIDON without success. I discovered that VORNICU and SPIRIDON did not have an address registered in the California Department of Motor Vehicles database. I also discovered that VORNICU and SPIRIDON were both residing

illegally in the United States. VORNICU was under removal proceedings, and recently failed to report to ICE on March 18, 2021. SPIRIDON was encountered by CBP Officers on April 27, 2018 when he was boarding a flight from Los Angeles to London. SPIRIDON had no documented entry into the United States, and therefore appeared to have been smuggled into the United States without inspection, or to have entered using a different identity. SPIRIDON was removed from the United States the same day.  There is still no record of SPIRIDON's re-entry into the United States following his 2018 removal, so he appears to have been smuggled back into the U.S. again.

14.  Further open source research lead me to the address 5904 Warner Avenue #178, Huntington Beach, CA. According to open source research, this address was listed as the residence of both VORNICU and SPIRIDON. It was later discovered that the SUBJECTS also provided this address as their residence to Apple, Western Union, Moneygram, JP Morgan Chase, and the Bellagio Hotel & Casino. On December 15, 2020, I responded to 5904 Warner Avenue, Huntington Beach, CA. I discovered that this location is actually "The Mailbox Center", a mailbox rental and shipping location, not a residence.

**D.   VORNICU's and SPIRIDON'S Telephones Identified**

15.  According to records provided pursuant to a subpoena to Apple, Inc., Western Union, Moneygram, and Instagram, 323-949-4666 ("**VORNICU's Telephone**") is registered to VORNICU.

16.   According to T-Mobile records, **VORNICU's Telephone** is registered to the alias "Adrian Mutu". Based on my training and experience, criminals often utilize phones registered under an alias in order to avoid detection from law enforcement.

17.   According to open source record checks and Experian phone data, 323-542-4591 ("**SPIRIDON's Telephone**") is registered to SPIRIDON in his true name at The Mailbox Center PO Box: 5904 Warner Avenue #178, Huntington Beach, CA.

18.   Both **VORNICU's Telephone** and **SPIRIDON'S Telephone** are pre-paid.  In my training and experience, criminals often prefer to use pre-paid phones because they typically do not involve a credit check, so it is easier to obtain them using a false name, as VORNICU did, or using other false information.

**E.    GPS Ping Warrant Obtained for VORNICU's and SPIRIDON's Telephones**

19.   On January 22, 2021, the Honorable Alka Sager, United States Magistrate Judge, signed a search warrant authorizing the collection of prospective cell-site information, GPS information, as well as information from a cell-site simulator on **VORNICU's Telephone** and **SPIRIDON's Telephone**.

**F.    ATM and other Video Surveillance Captured VORNICU and SPIRIDON Skimming Debit Cards**

<u>**VORNICU**</u>

20.   Victim financial institutions, retail locations, and physical surveillance have captured photos and video footage showing approximately 16 separate instances in which VORNICU was

captured installing or removing/attempting to remove skimmers and making unauthorized withdrawals. At least 98 customer accounts have been compromised as a result of this activity between January 2020 and March 2021 according to bank records. I have personally reviewed many photos of VORNICU to include passport photos and social media posts. I have also conducted surveillance operations targeting VORNICU on multiple occasions. Based on these observations, I can confirm that VORNICU is the individual depicted in photos and video surveillance provided from financial institutions, retail stores, and local law enforcement.

21.  In these photographs, VORNICU is wearing clothing including a black baseball style hat with an American flag, various t-shirts and hooded and non-hooded sweatshirts in green camouflage style, and a black puffy winter vest.

**SPIRIDON**

22.  Victim financial institutions and retail locations have provided photos and video footage showing at least 7 known instances in which SPIRIDON has been captured installing or removing/attempting to remove skimmers and making unauthorized withdrawals. At least 484 customer accounts have been compromised as a result of this activity between January 2018 and March 2021 according to bank records. I have personally reviewed many photos of SPIRIDON to include passport photos and social media posts. I have also conducted surveillance operations targeting SPIRIDON on multiple occasions. Based on these observations, I can confirm that SPIRIDON is the

individual depicted in these photos and video surveillance provided from financial institutions, retail stores, and local law enforcement.

23.   In these photographs, SPIRIDON is seen wearing several different baseball-style hats as well as a green camouflage style jacket, a white-and-black hooded sweatshirt, and a black puffy winter vest. SPIRIDON also sometimes wears aviator-style sunglasses with white arms

### VORNICU Is Seen Using Many Cards at Many ATMS

24.   On or about February 26, 2021, surveillance was conducted on VORNICU utilizing the GPS Pings. During the course of this physical surveillance, law enforcement officers observed VORNICU drive to multiple financial institutions in Los Angeles and Orange Counties. Specifically, VORNICU was observed withdrawing or attempting to withdraw funds from:

a.   Schools First Federal Credit Union: inside Stater Bros. Markets, 6501 East Spring Street, Long Beach, CA.

b.   LBS Financial Credit Union: 6417 East Spring Street, Long Beach, CA.

c.   Wells Fargo: 6402 East Spring Street, Long Beach, CA.

d.   Cardtronics ATM: inside Rite Aid, 6400 East Spring Street, Long Beach, CA.

e.   Schools First Federal Credit Union: inside Stater Bros. Markets, 7101 Warner Ave, Huntington Beach.

f.   Cardtronics ATM: inside CVS, 7191 Warner Ave, Huntington Beach, CA.

g.   Schools First Federal Credit Union: 7151 Warner Ave, Huntington Beach, CA.

25.   On or about March 11, 2021, surveillance was conducted on VORNICU utilizing the GPS Pings. During the course of this physical surveillance, law enforcement officers observed VORNICU drive to multiple financial institutions in Los Angeles and Orange Counties. Specifically, VORNICU was observed withdrawing or attempting to withdraw funds from:

a.   Schools First Federal Credit Union: inside Stater Bros. Markets, 6501 East Spring Street, Long Beach, CA.

b.   LBS Financial Credit Union: 6417 East Spring Street, Long Beach, CA.

c.   Allpoint ATM: inside Ralphs, 4023 Ball Road, Cypress, CA.

d.   Union Bank: 4125 Ball Road, Cypress, CA.

26.   At each location, VORNICU was observed using multiple cards to withdraw or attempt to withdraw funds at each ATM.

27.   The number of victims and approximate loss amounts has been requested from these potential victim financial institutions, but full accounting has not yet been received. From the account information that has been returned, I have identified approximately 25 accounts that were compromised by VORNICU during these surveillance operations.

**SPIRIDON Is Seen Using Many Cards at an ATM**

28.   On or about March 22, 2021, surveillance was conducted on SPIRIDON utilizing the GPS Pings. During the course of this physical surveillance, law enforcement officers observed

SPIRIDON drive to a financial institution in Los Angeles County. Specifically, SPIRIDON was observed withdrawing or attempting to withdraw funds from Wells Fargo, 1625 West Olympic Boulevard, Los Angeles, using multiple cards.

29.  On or about April 1, 2021, surveillance was conducted on SPIRIDON utilizing the GPS Pings. During the course of this physical surveillance, law enforcement officers observed SPIRIDON drive to multiple financial institutions in Los Angeles and Orange Counties. Specifically, VORNICU was observed withdrawing or attempting to withdraw funds from:

       a.    Wells Fargo: 717 West Olympic Boulevard, Los Angeles, CA.

       b.    Bank of America: 7257 West Sunset Boulevard, Los Angeles, CA.

30.  The number of victims and approximate loss amounts has been requested from these potential victim financial institutions, but full accounting has not yet been received.

**GPS Pings Used to Identify Additional Fraud**

31.  I analyzed the location data of the GPS Pings associated with VORNICU and SPIRIDON in an effort to identify additional locations where ATM skimming devices may have been installed and/or unlawful withdrawals occurred. Based on that analysis, I determined that VORNICU was in the vicinity of multiple Stater Bros. Markets in Los Angeles and Orange County. I requested surveillance video from Stater Bros. Markets Security, and after reviewing the video I observed VORNICU utilizing the ATMs inside these stores. Specifically, VORNICU

11

was observed withdrawing or attempting to withdraw funds from the following locations:

     a.   January 26, 2021: Schools First Federal Credit Union: inside Stater Bros. Markets, 6501 East Spring Street, Long Beach, CA.

     b.   January 26, 2021: Schools First Federal Credit Union: inside Stater Bros. Markets, 7101 Warner Ave, Huntington Beach.

     c.   February 9, 2021: Schools First Federal Credit Union: inside Stater Bros. Markets, 7101 Warner Ave, Huntington Beach.

     d.   March 9, 2021: Schools First Federal Credit Union: inside Stater Bros. Markets, 7101 Warner Ave, Huntington Beach, CA.

     e.   March 11, 2021: Schools First Federal Credit Union: inside Stater Bros. Markets, 10051 Valley View Street, Cypress, CA.

32.  At each location, VORNICU was observed using multiple cards to withdraw or attempt to withdraw funds at each ATM.

33.  The number of victims and approximate loss amounts has been requested from these potential victim financial institutions, but full accounting has not yet been received.

**VORNICU and SPIRIDON Are In Regular Contact**

34.  Investigative efforts have determined that VORNICU and SPIRIDON are in consistent contact. According to WhatsApp toll records provided pursuant to a court order, VORNICU and SPIRIDON exchanged 52 WhatsApp messages between December 15, 2020 and

February 7, 2021. VORNICU, SPIRIDON, and Arsin have also been
observed together around Los Angeles and on trips out of the
city to include Las Vegas, Nevada. The GPS Pings associated with
their telephones have also been observed moving in a pattern
consistent with VORNICU and SPIRIDON traveling together in Los
Angeles County, Orange County, San Bernardino County, and the
state of Nevada.

**G.    Cash Deposits by VORNICU**

35.  Based on an analysis of financial records acquired
pursuant to subpoenas, I learned that between August 4, 2020 and
February 15, 2021, VORNICU made 85 cash deposits into his JP
Morgan Chase Checking Account. The total amount of these cash
deposits was $94,080. The cash deposits ranged from $200 to
$3,150 per transaction. The source of these funds is likely the
profits from ATM skimming as VORNICU has never been observed at
any location of employment and does not have legal permission to
work in the United States.

36.  Based on my training and experience, individuals
committing access device fraud often have frequent and
unexplained cash deposits as a means of hiding the profits of
their criminal activity.

**H.    VORNICU and SPIRIDON Avoid Law Enforcement Detection by
       Using and Frequently Switching Rental Vehicles**

37.  Between March 27, 2018 and April 1, 2021, I identified
35 separate rental vehicle reservations made by VORNICU,

13

SPIRIDON, and Arsin in California. Within these 35 separate rental reservations, I observed and/or identified 64 different rental vehicles that were checked out by VORNICU and SPIRIDON.

38.  These vehicles and reservations were identified based on physical surveillance and records provided pursuant to subpoenas issued to Enterprise Holdings, Inc. The last vehicle VORNICU was observed driving is VORNICU'S WHITE CHRYSLER. This vehicle was rented on or about March 14, 2021 and is currently in VORNICU'S possession, as discussed in more detail below. The last vehicle SPIRIDON was observed driving is SPIRIDON'S WHITE CHALLENGER. This vehicle was rented on or about April 1, 2021, and is in SPIRIDON's possession, as discussed later.

39.  Based on my training and experience, individuals committing fraud, especially those residing illegally in the United States, often engage in nomadic activity such as frequently switching rental cars and addresses in an effort to evade detection by law enforcement.

## I.   VORNICU and SPIRIDON Avoid Law Enforcement Detection by Staying at Airbnb Rentals

40.  Between December 11, 2019 and April 1, 2021, I identified 28 separate Airbnb reservations paid for by VORNICU and Arsin. VORNICU spent $24,393 on Airbnb reservations since August 2020, and Arsin spent $11,118 on Airbnb reservations since July 2020.

41.  These reservations were identified based on records provided pursuant to subpoenas issued to Airbnb, JPMorgan Chase, and Bank of America.

**J.   VORNICU and SPIRIDON Hide from Law Enforcement by Listing a Commercial Mailbox as Their "Residence"**

42.  According to records from Apple, VORNICU's listed mailing address is 5904 Warner Avenue, Huntington Beach, CA, the Mailbox Center mentioned above. These records show that on November 6, 2020, VORNICU purchased an iPhone 12 Max via the Apple Online Store and it was shipped to 5904 Warner Avenue, Huntington Beach, CA. According to records from several other institutions, to include Western Union, Moneygram, and JP Morgan Chase, and the Bellagio Hotel & Casino, VORNICU listed 5904 Warner Avenue #178 as his mailing address.

43.  This is corroborated by physical surveillance conducted on February 26, 2021. FBI Agents and Task Force Officers observed VORNICU enter The Mailbox Center and depart with unknown paperwork.

44.  Open-source records also list 5904 Warner Avenue #178, Huntington Beach, CA as SPIRIDON's address. This is corroborated by records from Western Union and Moneygram.

45.  Based on my training and experience, criminals trying to avoid the detection of law enforcement will often use a PO Box to receive packages and letters in order to prevent law enforcement from detecting their true residence.

**K.   SPIRIDON Has Been Skimming in the U.S. at Least Since 2018**

46.   FBI Special Agent Benjamin Glynn told me that he observed SPIRIDON on surveillance video in January of 2018 inserting sequentially at least seven separate cards into one ATM in the Western District of Michigan. Based on the activity observed on video, SA Glynn determined that SPIRIDON was attempting to unlawfully withdraw funds from customer accounts. FBI SA Glynn reviewed the video and positively identified SPIRIDON.

**L.   Many Other Jurisdictions Have Investigated Skimming by VORNICU and SPIRIDON, But Failed to Identify Them Before They Left Those Jurisdictions**

**VORNICU and SPIRIDON's Skimming in Newport Beach in January 2020**

47.   I spoke to Detective Daniel Mersi of the Newport Beach Police Department. Detective Mersi provided me with a police report and still photos from ATM surveillance of a skimming incident in January 2020.

48.   According to the police report, on or about January 4, 2020 at approximately 6:41 AM, "Suspect 1," later identified as SPIRIDON and hereafter referred to as such, was captured on surveillance video installing a skimming device at the Comerica Bank located at 2131 Westcliff Drive, Newport Beach, CA. At approximately 6:43 AM, "Suspect 2," later identified as VORNICU, was captured on surveillance video appearing to check that the skimming device was working properly. On January 5, 2020 at approximately 6:04 AM, SPIRIDON was captured removing the

16

skimming device. The suspects may have departed in a "black Cadillac sedan".

49.   I reviewed photos from an ATM camera identifying "Suspect 1", "Suspect 2", and the "black four door Cadillac sedan". I was able to positively identify SPIRIDON as "Suspect 1" and VORNICU as "Suspect 2". Furthermore I determined that during the timeframe in question, VORNICU had rented a black Cadillac XTS bearing CA Plate 8KWB114, likely the "black Cadillac sedan" referenced in the report.

50.   Comerica Bank provided records regarding this incident. It was determined that 74 Comerica Banks cards were compromised and funds were unlawfully withdrawn from 11 cards totaling approximately $28,263.

**SPIRIDON's Skimming in Tustin in March 2020**

51.   I spoke to Investigator Denise Alves of the Tustin Police Department. Investigator Alves provided me with a police report and still photos from ATM surveillance of a skimming incident in March 2020.

52.   According to the police report, between March 17, 2020 and March 31, 2020, an ATM skimming device was placed on ATM X0680647, located at Comerica Banking Center 955 located at 3025 El Camino Real, Tustin, CA. This date range was determined based on ATM suspicious activity claims to Comerica Bank. Comerica Bank provided ATM video of the thefts and it was determined the "Suspect" (SPIRIDON) visited the compromised ATM terminal on at least four separate occasions between March 19, 2020 and March 21, 2020.

17

53.   I reviewed the photos from the ATM camera identifying the "Suspect". I was able to positively identify SPIRIDON as the "Suspect".

54.   Comerica Bank provided records regarding this incident. It was determined that 62 Comerica Banks cards were compromised and it was determined that funds were unlawfully withdrawn from 14 cards totaling approximately $1,442.

**SPIRIDON's Skimming in South San Francisco in February 2020**

55.   I spoke to Officer Keawe Sham of the South San Francisco Police Department. Officer Sham provided me with a crime bulletin identifying an "unknown suspect" (SPIRIDON) who inserted and later removed a skimming device at the Comerica Bank located at 401 Grand Avenue, South San Francisco, CA between February 6, 2020 and February 21, 2020. I reviewed the photos from the crime bulletin of the "unknown suspect". I was able to positively identify SPIRIDON as the "unknown suspect".

56.   Comerica Bank determined that 93 Comerica Banks cards were compromised and funds were unlawfully withdrawn from 17 cards totaling approximately $3,160, according to their business records.

**SPIRIDON's Skimming in Cypress and Marina Del Rey in 2019**

57.   In addition to the above mentioned 2020 skimming incidents, Comerica Bank was able to provide photos of the following skimming activity in December 2019, which I reviewed and saw showed SPIRIDON:

a.   On December 13, 2019, a skimming device was discovered in an ATM at the Comerica Bank located at 6812

Katella Ave, Cypress, CA. Based on business records and customer reports of fraud, Comerica Bank determined the skimming device was installed and functioning between December 12, 2019 and December 13, 2019. Comerica Bank provided records regarding this incident, showing that 8 Comerica Bank cards were compromised, but no funds were withdrawn.

b.   On January 2, 2020, a skimming device was discovered on an ATM at the Comerica Bank located at 4040 Lincoln Blvd, Marina Del Rey, CA. Based on business records and customer reports of fraud, Comerica Bank determined that the skimming device was installed and functioning between December 16, 2019 and December 21, 2019. Comerica Bank provided records regarding this incident showing that 239 Comerica Banks cards were compromised and funds were unlawfully withdrawn from 18 cards totaling approximately $10,811.

**M.   Subject Residences**

58.   Due to the nomadic nature of VORNICU and SPIRIDON, they often change residential locations (as described above), sometimes even rotating between a number of known common locations. They utilize Airbnb rentals in their name, and other rental properties in the names of known and unknown individuals. Law enforcement officers have identified three locations where VORNICU and SPIRIDON often reside, and where VORNICU and SPIRIDON are key holders with consistent actual physical access to all three locations.

**VORNICU and SPIRIDON Stay at 700 WEST 9ᵀᴴ STREET, APT. 3013, LA**

59.   Law enforcement officers have seen vehicles associated with VORNICU parked in the space assigned to APARTMENT 3013 (SPACE L3139) and in the vicinity of 700 WEST 9TH STREET on eight different occasions between February 20, 2021, and March 25, 2021, and as recently as March 25, 2021. These vehicles were associated with VORNICU because surveillance officers had earlier seen VORNICU driving them, and EAN Holdings confirmed VORNICU rented them.  Property management for 700 WEST 9TH STREET informed me that space L3139 was reserved for and assigned to APARTMENT 3013.  Law enforcement officers have also seen vehicles parked in SPACE L3139, and in the vicinity of 700 WEST 9TH STREET, that they had earlier seen SPIRIDON driving, and that EAN Holdings confirmed SPIRIDON rented, on ten different occasions between February 17, 2021 and April 1, 2021, and as recently as April 1, 2021.  On March 11, 2021, I observed SPIRIDON walk into the lobby of 700 WEST 9TH STREET and take the elevator to the 30th floor.  On numerous occasions, dating as far back as January 25, 2021 and as recently as April 4, 2021, GPS pings placed **VORNICU's Telephone** and/or **SPIRIDON's Telephone** during overnight hours in the vicinity of 700 WEST 9TH STREET.

60.   Due to the controlled access to the garage and to the building elevator, a security key fob must be used in order to enter the garage and to utilize the elevator to access the residential floors. Furthermore, the key fobs are specifically assigned to the floor the resident lives on. I have been inside the parking garage and observed the elevator leading to 700 WEST 9TH STREET, APT. 3013. The only way to utilize the elevator to

access the 30th floor of the building is by using a security key
fob. This leads me to believe that both VORNICU and SPIRIDON
have a security key fob granting them access to the garage and
residential floors.

**SPIRIDON and Arsin Stay at 6550 YUCCA STREET, APT. 203**

61.  I have seen SPIRIDON, Arsin, and Anastasiia Evdokimova
smoking a cigarette on the balcony of APT. 203 as recently as
March 19, 2021. On numerous occasions, dating as far back as
February 18, 2021 and as recently as April 4, 2021, GPS pings
placed **SPIRIDON's Telephone** during overnight hours in the
vicinity of 6550 YUCCA STREET, LOS ANGELES. Furthermore, on
three different occasions, dating as far back as March 3, 2021
and as recently as March 19, 2021, law enforcement officers have
seen vehicles parked in the subterranean garage of 6550 YUCCA
STREET that they had earlier seen SPIRIDON driving, and that EAN
Holdings confirmed SPIRIDON rented.

62.  Finally, on March 19, 2021, a note written on a white
piece of paper was seen, in plain view, on the dashboard of a
white Jeep Cherokee bearing CA License Plate 8UXT569, registered
to EAN Holdings. Due to my knowledge of the investigation, I
know this vehicle to be rented by SPIRIDON and I have observed
SPIRIDON driving this vehicle. The note read "if this is your
spot please call me: 562 632 7521". I called this phone number
and a woman identifying herself as "Ellen" answered the phone.
Ellen confirmed that she was inside APARTMENT 203 and that the
white Jeep belongs to that apartment. Approximately one hour
later, I observed SPIRIDON depart the garage driving the white

Jeep. I have been inside 6550 YUCCA STREET, and confirmed that APT. 203 is the apartment associated with the balcony where SPIRIDON, Arsin, and Evdokimova were observed.

63.   On March 26, 2021, I knocked on the door of APT. 203. A person I later determined to be Olena Kaptilova based on a photograph in her immigration records answered the door and identified herself as "Ellen". I believe this to be the same "Ellen" who linked herself to SPIRIDON's vehicle on March 19, 2021.  The listed tenants of APT 203 are Evdokimova and Kaptilova.  Kaptilova's phone number on her lease is the same phone number used by "Ellen".

64.   According to the building manager, Evdokimova and Kaptilova have been tenants of the building since October 2020. The building manager recognized a photograph of Arsin and noted he had consistently been seen in the building with Evdokimova and Kaptilova beginning in November 2020, and as recently as March 2021. FBI Surveillance units observed Evdokimova drive SPIRIDON to the Los Angeles International Airport Rental Car Center to pick up SPIRIDON'S WHITE CHALLENGER on April 1, 2021. SPIRIDON visited 6550 YUCCA STREET later that evening.

**VORNICU Also Stays at 711 PACIFIC COAST HIGHWAY, UNIT 326**

65.   Physical surveillance and an analysis of GPS pings for **VORNICU's Telephone** placed VORNICU in the vicinity of Huntington Beach during overnight hours beginning on March 18, 2021. On March 25, 2021, surveillance teams observed VORNICU driving into the parking lot of 711 PACIFIC COAST HIGHWAY, HUNTINGTON BEACH, CA and to PARKING SPOT 326 in VORNICU'S WHITE CHRYSLER. Business

records show this vehicle is rented by VORNICU through April 4, 2021.  (VORNICU has often kept his rentals beyond their initial return date in the past.)  I have observed VORNICU driving VORNICU'S WHITE CHRYSLER. On March 26, April 1, and April 4, 2021, I observed VORNICU'S WHITE CHRYSLER in PARKING SPOT 326. I conducted surveillance within the complex, and identified UNIT 326 in the northwestern corner of the complex. On April 1, 2021, I confirmed with the owner of UNIT 326 that PARKING SPOT 326 is assigned to UNIT 326, and that VORNICU is currently renting UNIT 326.

66.  Of note, VORNICU was first observed in the vicinity of this location on March 18, 2021. This is the same day VORNICU returned from a trip to Las Vegas, NV with SPIRIDON and Arsin. It is also the same day VORNICU failed to appear before Immigration and Customs Enforcement (ICE) for removal proceedings.

**DURATION OF THE FRAUD**

67.  Law enforcement reporting from the United Kingdom indicates SPIRIDON was arrested, but later released, for Bank Fraud in 2015. Chiforescu, VORNICU, and SPIRIDON were part of a police investigation in 2017 for card skimming activities throughout the United Kingdom. The conclusion of that investigation lead to Chiforescu being convicted and deported back to Romania. According to information provided by Romanian law enforcement, since his deportation from the United Kingdom, Chiforescu has dispatched numerous crews of ATM skimmers to the United States.

**Training and Experience Regarding Fraud:**

68.   Individuals involved in identity theft schemes like this one must keep evidence of their schemes, such contact information for their co-conspirators, lists of victim information and accounts used in the scheme, simply to keep the scheme going.  Much of this evidence is now stored on digital devices such as computers and smartphones.

69.   Generally, perpetrators of skimming and identity theft schemes maintain this evidence where is close at hand and safe, such as in their residences, automobiles, and, especially with smartphones, on their person.  For larger or more sophisticated frauds, participants often attempt to distance themselves from some of the incriminating evidence by renting public storage units or safety deposit boxes where they often keep the items they will not need immediate access to.

70.   Information received from law enforcement officers with knowledge and specialized experience in ATM skimming fraud cases told me subjects commonly rent storage units in which they keep shimmer devices, tools, credit card makers, and raw materials used to make shimmers and tools.

71.   I have heard of cases in which card skimmers have embossed their own names on the front of counterfeit access devices so that they could use the counterfeit cards openly and with their own identification cards.  I know from my training and experience that card skimmers and counterfeiters often re-encode gift cards that have no value left on them as credit or debit cards.  This is both convenient for them as they can get

their counterfeit stock for free and it makes the cards appear legitimate without elaborate additional printing on them of logos and the like; the counterfeit credit and debit cards simply appear to be a gift card from a store. Both these techniques will likely prevent law enforcement from being able to tell if the facially legitimate looking cards are actually part of the skimming scheme just from seeing at them.

72. Members of a criminal conspiracy must of necessity communicate with one another. Commonly this is done by text, email, telephone, or specialty communication application, often an encrypted one such as WhatsApp, and most often by smartphone. Members of the conspiracy commonly carry their smartphones, which include the contact information for their co-conspirators, on or near their persons, such as in their cars or residences.

## V.   **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**[1]

73. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

74.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

        b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

75.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the thumb and/or fingers of CONSTANTIN VORNICU, COSMIN SPIRIDON, and Daniel Arsin on the device(s); and (2) hold the device(s) in front of those persons' faces with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

76.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## CONCLUSION

77.  Based upon the foregoing facts and my training and experience, I believe there is probable cause to believe that VORNICU and SPIRIDON conspired to commit bank fraud and committed aggravated identity theft in violation of Title 18, United States Code, Sections 1344, 1349, and 1028A, and that evidence of the violations listed in Attachment B will be found at the SUBJECT PREMISES.

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this  5th day of April, 2021.


_____    MAA
UNITED STATES MAGISTRATE JUDGE

29